UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Wendy C., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 19 CV 50111 |
| ) | Magistrate Judge Iain D. Johnston |
| Andrew Saul, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, who is now 53 years old, worked for twenty-plus years in series of low-wage jobs including being a cook and a cashier in a gas station. In her most recent job, a six-year stint, she worked as a call center operator for a supply company. She answered the phones, typed up quotes, and worked on the computer. R. 52, 200. This work was done while sitting. Her last day was on April 14, 2016. R. 40.

Five days later, she underwent surgery to remove a tumor located in the vestibular nerve leading from the inner ear to the brain. R. 21. The medical term is an acoustic neuroma. Although the tumor was benign, the surgery caused some lingering and apparently permanent problems in her ability to feel, hear, and see. The left side of her face is numb, and she has difficulty smiling. She has lost much of the hearing in her left ear, and her vision in her left eye is greatly compromised. She described it as being like "triple vision" where she looks at an object and sees "it three times like sideways." R. 51. Because the tumor surgery affected several cranial nerves, plaintiff has had problems closing the left eye and problems with her tear gland, causing eye dryness. She often wears a patch over her left eye. And she must frequently put drops in her

1

eyes, more so when she doesn't wear the patch. She had three surgical procedures, after the tumor surgery, to try to correct the eyelid problem, but it still persists. R. 44-45. She claims these problems would make it difficult to work at the call center.

She is also now at a higher risk for falls. Her gait is unsteady, and she alleges that she has been using a cane since the surgery, after initially using a walker. She does not go down the stairs to the basement to do laundry and will only take showers when her husband is at home because she fears falling. R. 49. She uses a scooter at the grocery store. She gets dizzy at times, although it is not clear whether it is only when walking or standing. After the surgery, she underwent physical, occupational, and speech therapy. R. 21.

She has other symptoms including fatigue, drowsiness, headaches, and pain. It is not clear whether all of these are caused by the tumor surgery. Plaintiff has suggested that the headaches are related to the left side facial paralysis. Some of the pain is connected to the incision sites at the ear and eye. And plaintiff has taken some pain medication, such as Neurontin, although it is not clear how often or how long she has been taking these medications. Plaintiff has complained that her medications make her "really, really tired." R. 46.

Plaintiff has a few other impairments not connected to the tumor surgery. These include tennis elbow, which she has had since 2011; anxiety and depression, which also pre-date the surgery; hypertension; and chronic kidney disease. She has received some treatment for these conditions. She receives cortisone shots every three months for the tennis elbow. R. 46. Plaintiff's primary care physician has prescribed Xanax for the anxiety and panic attacks. But more broadly, plaintiff's claim for being found disabled rests on the argument that the combined cumulative effect of all these impairments, both major and minor, both physical and mental, would prevent her from working.

The relevant medical history mainly concerns the year-and-a-half period from the tumor surgery (April 2016) until the hearing (December 2017). During this time, plaintiff's main doctor was her primary care physician, Dr. Jocelyn Go-Lim. She is a central figure in this lawsuit because she completed a four-page questionnaire supporting plaintiff's case. Ex. 10F. Among other things, Dr. Go-Lim opined that plaintiff could sit or stand or walk for less than two hours; that she uses a cane because she gets off balance easily; that she would need to take breaks frequently (every 10 to 15 minutes); that she has muscle weakness, chronic fatigue, dizziness, and headaches; that she has blurred vision in her left eye; and that she could use her hands, fingers, and arms zero percent of the time to do manipulative tasks. R. 878-880. Dr. Go-Lim completed this form on September 13, 2017. Around this same time, she also prescribed a cane for plaintiff. The timing of this prescription is a fact the ALJ used to doubt plaintiff's entire testimony.

Although Dr. Go-Lim was the primary care physician, plaintiff saw other doctors during this time, including some other doctors in the same office, the eye doctor who performed the three eyelid surgical procedures, and an oncologist who saw plaintiff after the brain tumor surgery. This oncologist, Dr. Khan, is also an important person for plaintiff's case.

On March 28, 2018, the ALJ issued a decision finding plaintiff not disabled because she could do sedentary work and specifically could do her past relevant work as a customer service representative, order clerk, and warranty clerk. At Step Two, the ALJ found that the tennis elbow, hypertension, kidney disease, anxiety, and depression were not severe impairments. Among other things, the ALJ noted that plaintiff had "no history of psychiatric care, hospitalizations or limitations." R. 22. The ALJ questioned Dr. Go-Lim's statement on the RFC questionnaire that plaintiff would be off task 25% of the time and would miss work four or more

3

days a month. The ALJ also found that plaintiff did not meet any listing, a conclusion plaintiff does not challenge here.

Plaintiff's arguments instead focus on the RFC analysis, which is about a page and a half. It consists of two parts. In the credibility analysis, which was the first part, the ALJ cited to three rationales (or examples) to find plaintiff not credible. As for the medical opinion analysis, the ALJ found that Dr. Jilhewar's (the medical examiner) hearing testimony deserved great weight and that Dr. Go-Lim's written opinion deserved little or no weight. Overall, the ALJ's decision, at just a smidge over seven pages, is short by comparison to most ALJ decisions seen by this Court. One possible explanation is that the ALJ did not include the traditional narrative summary of the medical visits. Although the Court does not wish to discourage brevity, in this case, this decision may have contributed to some of the omissions described below.

## DISCUSSION

Plaintiff's opening brief has four main argument headings, with several sub-arguments tucked inside these four containers. First, plaintiff argues that the ALJ erred in rejecting Dr. Go-Lim's opinion because, among other reasons, the ALJ ignored an entire line of evidence. Second, plaintiff argues that the ALJ failed to fully consider plaintiff's mental impairments. Plaintiff does not challenge the finding that these impairments were not severe, but she still believes they should have been added into the RFC calculation and might have functioned as additional straws on the camel's back. Third, plaintiff argues that the ALJ failed to fully consider her hearing problems, in particular the fact that plaintiff's hearing was worse up until September 2017 when she got hearing aids. Fourth, the ALJ did not adequately address plaintiff's subjective allegations. This latter argument addresses what is typically referred to as the credibility analysis.

4

The Court will not strictly follow plaintiff's argument framework nor address every argument being raised. Instead, the Court will address the main arguments it found justified a remand. The Government's brief mostly relies on a harmless error argument.

**I.    The Overlooked Line of Evidence**

The most natural argument to begin with is the claim that the ALJ missed an entire line of evidence. This argument rests on the general rule, cited in many cases, that "ALJs need not address every piece of evidence in the record, but an ALJ may not ignore an entire line of evidence contrary to her ruling." *Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020) (internal citation omitted). Plaintiff argues that the line of evidence ignored here was her treatment records with Dr. Khan. This failure, according to plaintiff, is alone enough to justify a remand.

The argument is fairly easy to summarize. During the relevant year-and-half treatment period, plaintiff saw Dr. Khan about every three months. Although plaintiff is ostensibly relying on the entire set of treatment records from Dr. Khan, she primarily focuses on Dr. Khan's rating of plaintiff's condition on the ECOG scale used by oncologists. Throughout the treatment period, Dr. Khan consistently rated plaintiff as status level "2" on the 0-to-5 ECOG scale.[1] A "2" rating is described as an individual who is "ambulatory and capable of all selfcare but unable to carry out any work activities; up and about more than 50% of waking hours." Dkt. #13 at 3. Plaintiff argues that this rating reflects the doctor's opinion that plaintiff could not work and therefore bolsters Dr. Go-Lim's opinion to the same effect. (As discussed below, the Government tries to drive a wedge between these two opinions in its harmless error argument.)

One basic and critical fact is not in dispute. The ALJ never discussed or acknowledged the ECOG rating and more broadly never mentioned plaintiff's treatment with Dr. Khan at all.

---

[1] Dr. Khan gave the same "2" rating at multiple visits. Plaintiff cited to the places in the record where these ratings can be found. Dkt. #13 at 3 (citing R. 1121, 1135, 1148, 1160, 1173, 1186, 1203, 1813, 1828).

He was entirely left out of the decision. Because the ALJ did not discuss this evidence, we do not know from the reading the decision what he thought about it or whether he perhaps overlooked it.

The latter possibility might initially seem like the most plausible option. The ECOG rating was merely a brief line in Dr. Khan's notes, basically just a number with no explanation, although it was repeated in the records for each office visit. Given that the record in this case was then almost 1700 pages (it is now over 1900 pages), these fleeting references might have been inadvertently lost in the shuffle. R. 37. But this possibility is foreclosed because, at the hearing, Dr. Jilhewar alerted the ALJ to the ECOG rating in the following colloquy, which we pick up midstream, just after Dr. Jilhewar finished his listing analysis:

> A [by Dr. Jilhewar] . . . *I wanted your honor to be aware of the following*. The oncologist has followed her every three months since the date of surgery and each time she goes to the oncologist—I'm looking for example for documentation—one moment. Oncologist advice in the chart, ECOG, E as in elephant, C as in Charlie, O, G as in Gosh, number two. That stands for Eastern Cooperative Oncology Group, evaluation of disability presented to the oncology called conditions. The documentation is 30F, Page 3, 30, I'm sorry, 30F, Page 30, 5/30/2017. And there are similar at every three months visits with the oncologist. Number 2, meaning able to do activities of daily living but in the opinion of oncologist, she cannot do any employment. I do not have such a policy by Social Security, I have clinical findings by the oncologist of motor disorganization of two extremities, therefore, I could not equal the listing of 11.05 B as boy, number three. *But I wanted your honor to be aware of that*.
>
> Q [by the ALJ] So, can you repeat that again? ECOG2, what does that stand for again?
>
> A Okay. It is the Eastern Cooperative Oncology Group, Eastern Cooperative Oncology Group. And four different levels, 0 to 4 levels, 0 is normal, 1 is sedentary capacity, 2 is able to do activities of daily living but no work activity, 3 and 4 are not able to do activities of daily living, 4 being bed-bound.
>
> Q And you said this is as an example that's on 30F. Page 13?
>
> A Thirteen. But he writes at each visit at the oncologist.

6

> Q I'm looking at 13—30F, 13, I don't see—
>
> A 5/30/2017, I will go to that page, one moment. My copy's coming up.
>
> Q Oh, I see it. I'm sorry. Is it on Page 15—
>
> A Fifteen.
>
> Q —which is performance status?
>
> A Yes.
>
> Q Okay. I see it. Okay. So, your opinion is she does not meet or equal any listings?
>
> A Listing, no, your honor.

R. 61-63 (emphasis added) (typos not corrected). The discussion of the ECOG rating surprisingly ended here in this anticlimactic dead end.

Several facts can be noted about this testimony. First, we have quoted it at some length to make clear that this evidence was not obscure or hidden deep in the record and then raised for the first time on appeal, thus raising a sandbagging concern. To his credit, Dr. Jilhewar *sua sponte* raised this issue. Second, Dr. Jilhewar's decision to flag this piece of evidence shows that he believed that it was not a minor fact that should be lightly dismissed. Third, and perhaps most critically, the ALJ never followed up and asked Dr. Jilhewar how he viewed this evidence. (Likewise, neither did plaintiff's counsel.) Therefore, we do not have the benefit of Dr. Jilhewar's opinion. It is true that Dr. Jilhewar's testimony that plaintiff would not meet a listing and that she could do sedentary work means that he was not persuaded by this evidence, but we do not know the specific reasons *why* this is so.

The Government offers a series of arguments meant to chip away at this evidence. Among other things, the Government argues that the "2" rating could be interpreted as being inconsistent with Dr. Go-Lim's opinion. The Government notes that the ECOG language stating

7

that a person with a "2" rating would be "up and about" half of her waking hours "directly contradicted" Dr. Go-Lim's opinion that plaintiff would not be able to stand or walk more than two hours in a typical workday. Dkt. #18 at 4. (Plaintiff disputes this argument.) The Government also argues that the ECOG rating is not a valid medical opinion because it purports to decide the bottom-line question of whether plaintiff is disabled. Although these arguments raise legitimate questions that can be investigated further on remand, the Court does not find that they sufficiently rebut the thrust of plaintiff's "line of evidence" argument. For one thing, none of these arguments were offered by the ALJ. Therefore, the Government's arguments run into the *Chenery* doctrine, which means that the Government must meet the higher harmless error standard. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) (the harmless error doctrine applies when the court can conclude with certainty that the ALJ would reach the same conclusion absent the error). For another thing, the Government narrows the question down to whether the ALJ should have considered the ECOG rating. While that evidence is important, plaintiff's complaint is really broader. She is also claiming that the ALJ ignored *all* of Dr. Khan's records. They consist of hundreds of pages, set forth in multiple exhibits. *See, e.g.*, Exs. 20F, 27F, 30F.

   The Court ultimately is not persuaded by the Government's attempt to squeeze the Dr. Khan evidence into the conceptual box of being a mere "snippet" of evidence. It is not always easy to tell when evidence becomes substantial enough to be re-classified into a "line of evidence." Unlike the late-night snacker who might try to convince himself that he only has a binary choice of either eating one Thin Mint or eating an entire sleeve, the practical reality is that there is usually a continuum with a vast reasonable middle ground. In this Court's view, this is also true with pieces and lines of evidence. But in this case, all things considered, the Court finds

8

that the Dr. Khan evidence is closer to the "line of evidence" side of the continuum. It consists of all the records from a doctor who treated plaintiff consistently over the entire relevant period.

Plaintiff suggests that this Court could end the analysis here because this error is enough by itself to justify a remand. But the Court need not consider this question because there is another significant reason to remand the case.

## II.  Credibility Rationale

The ALJ's credibility analysis, arguably the most critical part of the whole decision, was also insufficient. Employing the disfavored boilerplate, the ALJ found that plaintiff's testimony was "not entirely consistent." The ALJ relied on the following three rationales:

> After careful consideration of the evidence, the undersigned finds that her medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical and other evidence in the record. **[#1]** For example, Dr. Jilhewar noted her right vision was normal, raising a question of why she could not read. **[#2]** In addition, she testified she can and does drive, further casting doubt on her testimony. **[ #3]** The cane was not prescribed until September 2017 (9F), when she was noted to have right-sided bruises from falling (16F/11), raising a question of when she needed it, since she testified that she had been using it for 15 months before her doctor prescribed it. Last, her testimony exceeds the limitations reasonably inferred from the evidence.[2]

R. 24 (bolded brackets added by the Court). An ALJ's credibility determination should be reversed only if it is "patently wrong" *See Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015). Here, the Court finds that the ALJ's analysis does not satisfy this deferential standard because all three rationales are invalid for various reasons.

**Rationales #1 and #2—Reading and Driving.** The first two rationales can be discussed together because they both nominally address the larger issue of plaintiff's vision. This limitation

---

[2] This last sentence is arguably a fourth rationale. But the ALJ's explanation is entirely conclusory, making it hard to analyze.

is important because it might provide a reason for why plaintiff could not work at her previous jobs even if they were done while sitting, which would have accommodated her concerns about walking and balance.

As a preliminary point, the ALJ never squarely addressed this topic of plaintiff's vision anywhere else in the decision. As noted previously, there is no summary of the medical record. Noticeably, the decision contains no or only fleeting and vague references to several seemingly important facts alleged by plaintiff, including that she had three surgeries to address the eyelid problem, that she wears a patch on her left eye, and that she uses eye drops every 10 to 15 minutes to combat dryness.

The ALJ seemed to believe that plaintiff's ability to drive and to read cast doubt on her claims about her vision limitations. However, the ALJ's conclusions rest on an erroneous summary of the facts.

As for the reading accusation, the ALJ stated that "Dr. Jilhewar noted [that plaintiff's] right vision was normal, raising a question of why she could not read." R. 24. Although the ALJ attempts to hedge with the equivocal "raising a question" language, the clear implication is that plaintiff was lying or exaggerating when she claimed she could not read. But this accusation glosses over the pertinent factual details. Dr. Jilhewar testified as follows: "In the right eye with the correction is always 20/20, and therefore I could not understand the testimony of inability to read with the right eye." R. 58. This statement seems to rely solely on the fact that plaintiff's right-eye vision was 20/20, as measured at one or more doctor visits. As for plaintiff, she explained that her reading problem was that her right eye got tired *over time*. *See* R. 52 ( "I could not do [computer work] for more than 10 to 15 minutes at a time and then I'd have to take a 10 to 15-minute break because my eye gets tired."); R. 44 ("I have [] poor vision in my left eye, which

10

makes my right eye very tired and I have to take breaks about every 15 minutes to give my eyes a rest.").

The ALJ believed these two portions of testimony were contradictory, but looking at them more closely, these are easily reconciled. Plaintiff may have been able to see adequately in a one-time vision test at the doctor's office (*i.e.* scoring 20/20 on an eye chart test), but she still may not have been able to use the right eye to do computer work or read documents over longer time periods. On remand, the ALJ should investigate this question more, in conjunction with an expert, before leaping to the conclusion that plaintiff was being untruthful.

The second rationale suffers from the same basic error. The rationale is the following: "[Plaintiff] testified she can and does drive, further casting doubt on her testimony." For starters, the sentence is vague. What portion of plaintiff's testimony was contradicted? In particular, was the ALJ claiming that the ability to drive proved that plaintiff could work at a computer or read documents for a long period? At the hearing, there was some discussion about different aspects of visions, such as peripheral and depth vision, but these questions were not fully resolved. In any event, even if one were to assume that the type of vision needed to drive and review documents were the same, the ALJ's rationale is erroneous for the same concern about the difference between a one-time activity and a recurring activity. The ALJ left out details critical to this question. We can let the testimony speak for itself:

    Q  [by the ALJ] Do you have a driver's license?

    A  I do.

    Q  And how often do you drive?

    A  Probably once a week, maybe a mile.

    Q  And where do you go?

> A  To the grocery store if I have to or the doctor.
>
> Q  Do you have any difficulties driving?
>
> A  I do.
>
> Q  What are those difficulties?
>
> A  I have poor vision in my left eye. Pretty much, I can't—I have no peripheral vision on the left side of my face, therefore it makes it uncomfortable to drive.

R. 39.  This testimony makes clear that plaintiff's driving was very limited in time, roughly ten minutes a week. She presumably drove over a familiar path as well. This modest amount of driving is an attenuated basis for making judgments about how well plaintiff's eyes would hold up over a 40-hour week. In sum, the first two rationales are insufficient grounds for disbelieving plaintiff's testimony.

**Rationale #3—The Cane Prescription.** The third rationale is arguably the linchpin of the decision. This rationale does double duty, being used first to cast doubt on plaintiff's testimony and then again in the medical opinion analysis to cast doubt on Dr. Go-Lim's opinion. The Court will set forth below both statements because they express the same basic idea:

> The cane was not prescribed until September 2017 (9F), when she was noted to have right-sided bruises from falling (16F/11), raising a question of when she needed it, since she testified that she had been using it for 15 months before her doctor prescribed it.
>
> \*   \*   \*
>
> The claimant's treating physician, Dr. Go-Lim, submitted her RFC on September 13, 2017, the day after she first ordered a cane to assist ambulation. The fact that the claimant testified she had been using a cane for 15 months at that point raises the issue of why Dr. Go-Lim first ordered it right before submitting an RFC.

R. 24.

Before examining this rationale, it is important to note the deeper accusation lurking underneath it. Even though the ALJ again hedged the conclusion by using conditional language

12

("raising a question"/"raises the issue of why"), the inference being suggested is fairly clear. The ALJ apparently believed that plaintiff was malingering and possibly that Dr. Go-Lim was willing to go along with these efforts. As this Court has noted before, a malingering accusation, whether explicit or implicit, has the potential to "dominate all [other arguments] like the proverbial skunk thrown in the jury box." *Potega v. Berryhill*, 2017 WL 2461549, *4 (N.D. Ill. June 7, 2017). These accusations should not be casually tossed into a decision without being supported by solid evidence and without first considering alternative innocent explanations. *See, e.g., Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (the ALJ failed to "elicit an explanation" for why the claimant did not continue visiting the pain clinic but the ALJ should have done so because "[t]here are many possible explanations").

Turning to the cane rationale here, the Court has some initial uncertainty about exactly what the ALJ was implying. Two possibilities present themselves. One is that the ALJ doubted whether plaintiff ever, at any point in time, had walking or balance problems that would require a cane. The other alternative is that the ALJ merely doubted that plaintiff needed the cane *before* September 2017 when she asked for the prescription but that she did need one from that point forward. But it does not really matter which interpretation was intended.

The first theory—that plaintiff was faking all along—is erroneous. Numerous evidentiary sources suggest that plaintiff had problems with walking and balance. (And if she did have such problems, then it is a small inferential leap to assume that she needed a cane.) Dr. Go-Lim and other doctors indicated that plaintiff had walking and balance problems. As the ALJ noted in the quotation above from the ALJ's decision, Dr. Go-Lim observed that plaintiff had right-sided bruises from a fall. Plaintiff testified that she was continuously concerned about falling. Also, Dr. Jilhewar made several statements at the hearing suggesting that he believed that plaintiff did

13

have *some* problems since the surgery. *See, e.g.* R. 59 ("Subsequent sequela of the tumor as a result surgery has been loss of balance.").[3] But most convincingly, the ALJ herself concluded that plaintiff could only do sedentary work, a finding that was presumably based on her walking problems and which was also pegged to the date of the surgery. The second theory, which is that the cane was legitimately needed but that it only arose in September 2017, is erroneous as well. What would medically explain the emergence of this problem then? Was plaintiff's problem getting worse over time?

The next question to ask is whether it was possible that plaintiff would have started using a cane in May 2016 *even though she did not yet have a prescription for one*. The Seventh Circuit has clearly answered "yes" to this type of question. *See Parker*, 597 F.3d at 922 ("Absurdly, the administrative law judge thought it suspicious that the plaintiff uses a cane, when no physician had prescribed a cane."); *Eakin v. Astrue*, 432 Fed. Appx. 607, 613 (7th Cir. 2011) ("[T]he ALJ unreasonably faulted Eakin for not obtaining a prescription for her cane. As this court held in *Terry v. Astrue,* 580 F.3d 471, 477-78 (7th Cir. 2009), the fact that an individual uses a cane not prescribed by a doctor is not probative of her need for the cane in the first place.").

If plaintiff did not need a prescription, then why did she bother asking for one from her doctor several months before the hearing, well after she had started using one? The answer is not hard to fathom. She may have honestly and legitimately been trying to document her existing condition. This Court has repeatedly adjudicated cases where ALJs have faulted claimants, who claimed they needed a cane, because they never got a prescription for one. *See, e.g.*, *Edmonson v. Colvin*, 2016 WL 946973, *7, n.7 (N.D. Ill. Mar. 14, 2016).

---

[3] At the same time, he noted that she was released from the hospital after showing that she could ambulate at least some short distance. R. 59.

In sum, the cane rationale is infirm and not well explained. And because it was used to insinuate that plaintiff was malingering, it potentially colored the ALJ's thinking throughout the decision. As a result, it makes the task of affirming under the harmless error doctrine more difficult and less appropriate.

One final point about the credibility analysis is required. We have focused on the three affirmative rationales offered by the ALJ. But the analysis is also subject to the criticism that the ALJ did not consider other factors set forth in SSR 16-3p. One is treatment. The ALJ never directly addressed this issue in a thorough way. The ALJ did note at Step Two that plaintiff did not seek counseling for her mental health problems, but the ALJ did not address this issue regarding other aspects of plaintiff's condition. In their briefs, the parties debate this question to some degree. Plaintiff, for example, emphasizes that she had significant treatment, "including multiple surgeries and extensive occupational therapy, including facial exercises and speech therapy." Dkt. #13 at 15. This and other relevant treatment facts should be considered more fully on remand. The Court is not suggesting that all these inquiries will necessarily strengthen plaintiff's case. On the issue of physical therapy, Dr. Jilhewar noted that plaintiff did not continue this therapy in 2017 even though her doctors seemed to recommend it. R. 56. More generally, with regard to any treatment options not pursued, the ALJ should explore the possible reasons why this was so. *See, e.g., Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (an ALJ cannot "rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin").

**III.     The Remaining Arguments**

Having concluded that a remand is justified based on the above errors, the Court will not analyze all the remaining arguments, as they will have to be re-assessed on remand in any event. But the Court will comment on a few matters.

One of plaintiff's arguments is that the ALJ wrongly rejected Dr. Go-Lim's opinion and failed to give it the deference due a treating physician. We have already noted plaintiff's argument that Dr. Khan's ECOG rating, even if it were not accepted in full as the final word on plaintiff's condition, nonetheless might have tilted the balance back in favor of Dr. Go-Lim. But there are other concerns as well. Although the ALJ did nominally purport to apply the treating physician rule, the analysis was one-sided. The ALJ used the checklist factors to scrutinize Dr. Go-Lim's opinion but did not consider how those same factors applied to Dr. Jilhewar's opinion. *See Murphy v. Berryhill*, 2018 WL 6610287, *4 (N.D. Ill. Nov. 28, 2018 ) ("it is important that ALJs employ the 'same metrics' and the 'same level of rigor' in evaluating multiple opinions"). For example, the ALJ seemed to discredit Dr. Go-Lim because she was "apparently an orthopedist," but as plaintiff notes, Dr. Jilhewar was a gastroenterologist. R. 24, 254. It is not clear why one was better than the other in this case.

The ALJ's assertion that Dr. Go-Lim's opinion was not supported by objective evidence is the strongest rationale cited by the ALJ and one that may be relied on if it is further developed and supported on remand. For example, the ALJ asserted that Dr. Go-Lim's opinion that plaintiff "effectively had no use of either upper extremity to handle, finger or reach" (ALJ's wording) was contradicted by objective findings about grip strength. R. 24. With regard to this particular observation, the Court notes that Dr. Go-Lim's rating of plaintiff's task manipulation abilities contains the following handwritten statement above it: "pt has left eye blurred vision." R. 880.

16

Although the Court cannot know for sure, an argument could be made that the doctor's opinion was based more on a concern about hand to eye coordination rather than strength.

To be sure, there are some potential weaknesses in plaintiff's case, as the Government has vigorously attempted to point out. Plaintiff's argument for being disabled leans heavily on her balance and walking problems, yet the ALJ concluded that these were accommodated by the limitation to sedentary work. Other symptoms, such as the facial droop and inability to smile, although obviously unfortunate in terms of plaintiff's life, do not appear to cause any specific limitations in working the particular jobs identified by the vocational expert. Throughout plaintiff's brief, she sets forth a long list of symptoms, but it is not always clear which ones were caused by which impairments. It sometimes feels like a game of pin the symptom on the impairment. The Government seems to be complaining about this same point when it refers to plaintiff's "attempt to shoehorn wholly unrelated and disproportionate limitations based on mild impairments." Dkt. #18 at 1. If the walking and balance problems were accommodated by the RFC, then the key issues to address on remand are the more diffuse symptoms, in particular fatigue, drowsiness from medications, pain, dizziness (to the extent it occurs when not walking), and headaches. These symptoms need to be considered in more detail and also considered in terms of their cumulative impact. In support of its harmless error argument, the Government notes that plaintiff did not complain about some of these symptoms, such as fatigue, to her doctors. This argument certainly should be considered on remand. At the same time, the Seventh Circuit has noted that symptoms such as fatigue, which may result from medication side effects, are not always reported to doctors. *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) ("To begin with, we are skeptical that a claimant's failure to identify side effects undermines her

17

credibility—after all, not everyone experiences side effects from a given medication, and some patients may not complain because the benefits of a particular drug outweigh its side effects.").

In sum, even though the Court recognizes that plaintiff has some weaknesses in her case and possibly may not prevail on remand, the Court finds that she still deserves at least one full and fair consideration of all the arguments and evidence in her case. *See, e.g., Parker*, 597 F.3d at 924 ("Her case thus is not a strong one, but it is not so weak that we can deem it frivolous and ignore the grave deficiencies in the administrative law judge's opinion on grounds of harmless error, which is applicable to judicial review of administrative decisions and is thus an exception to the *Chenery* doctrine."). But counsel should make a concerted effort to raise and develop her arguments at the hearing on remand. Some of the present errors might have been ameliorated if counsel had asked more probing questions. If this case is again appealed here, this Court may find that any arguments not raised to the ALJ have been forfeited.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: July 28, 2020        By: _____
                                                 Iain D. Johnston
                                                 United States Magistrate Judge